IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 3, 2004 Session

## DONNA S. YOUNG v. FRED C. HARTLEY, M.D., ET AL.

**Appeal from the Law Court for Washington County**
**No. 20477     Thomas J. Seeley, Jr., Judge**

**FILED MAY 10, 2004**

**No. E2002-02925-COA-R3-CV**

Donna S. Young ("Plaintiff") sued Fred C. Hartley, M.D. ("Defendant")[1] claiming that during a tubal ligation, Defendant negligently performed additional surgeries upon Plaintiff's vaginal area without her consent and that those extra surgeries caused Plaintiff to suffer physical and emotional damage. After trial, the jury returned a verdict in Defendant's favor. Plaintiff appeals raising, among other things, several questions regarding the admission of evidence at trial. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Law Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., E.S, and CHARLES D. SUSANO, JR., J., joined.

Donna Sue Young, Johnson City, Tennessee, pro se Appellant.

James E. Brading; Charles T. Herndon, IV; and Bradley E. Griffith; Johnson City, Tennessee, for the Appellee, Fred. C. Hartley, M.D.

[1] Plaintiff also sued Johnson City Eye and Ear Hospital, Inc., d/b/a Johnson City Speciality Hospital and Medical Center Obstetrics and Gynecology, P.C., but took a voluntary dismissal as to these entities prior to trial.

# OPINION

## Background

Numerous lay and expert witnesses testified at the trial in this matter. Because of the number and type of issues raised in this appeal, it is necessary that we discuss in detail the evidence presented at trial.

In late April or early May of 1999, Plaintiff went to Defendant seeking a tubal ligation. Defendant performed a pregnancy test and determined Plaintiff was pregnant. Plaintiff claims she did not know she was pregnant when she went to Defendant's office. Defendant referred Plaintiff to the Knoxville Center for Reproductive Health where Plaintiff had an abortion. Plaintiff claims she had no complications from the abortion. Plaintiff has three children and gave birth vaginally each time. She admitted she had tears during the birth of her first two children, but does not recall having stitches with the last. Another doctor, Dr. Gantt, removed an inclusion cyst from the left side of Plaintiff's labia minora in 1992.

On May 27, 1999, approximately one month after the abortion, Defendant performed a tubal ligation on Plaintiff. Defendant claims that just prior to the surgery, Plaintiff asked him if he would remove a skin tag in her vaginal area. During the surgery, Defendant removed a skin tag from Plaintiff's right labia minora and placed two stitches in that area. Plaintiff, however, claims she never had a skin tag and never asked Defendant to remove one. Plaintiff sued Defendant claiming he had done two unnecessary surgeries in her vaginal area, removing a skin tag and removing an inclusion cyst, and that these extra surgeries caused damage to Plaintiff's clitoris.

Plaintiff remembers very little of her experience in the hospital pre-surgery. She does not recall speaking with Defendant prior to the surgery. Plaintiff stated she remembers being taken to a room and given a gown to change into. She stated "I just put on the gown and laid in the bed. The next thing I remember is a whole lot of people standing around me, and then . . . Then the next thing I remember was being in another room and everything was white. The walls were white, the carpet. I mean everything was just white . . . ." Plaintiff does remember a woman in a flowered dress telling her prior to surgery that her insurance would not cover the surgery.

Plaintiff stated that when she awoke from surgery she was "screaming in pain." She claims she experienced severe pain while at the hospital. Plaintiff also claims that although she wasn't bleeding bad before she left the hospital, she began bleeding from her vaginal area in the middle of the night, but not from her clitoris. Plaintiff claims that although she had minimal blood loss at the hospital, the bleeding that started in the middle of the night was considerable.

Pamela Johnson, a registered nurse who cared for Plaintiff in the recovery room known as the post-anesthesia care unit ("PACU"), testified that Plaintiff was in PACU for approximately forty-five minutes. Ms. Johnson explained that when a patient who has had a vaginal

-2-

entry or surgery arrives in PACU, Ms. Johnson cleans the patient's peri area and carefully checks for any bleeding. The records show Plaintiff had no vaginal bleeding on admission to PACU, halfway through Plaintiff's PACU stay, and upon discharge from PACU. Ms. Johnson charted that when Plaintiff left PACU, she was breathing well, was comfortable, reported that her pain had eased and had no vaginal bleeding. The records show Plaintiff received what Ms. Johnson described as a smaller than normal dose of pain medication in PACU. Although Plaintiff's blood pressure was elevated when she arrived in PACU, it was normal when she left. Ms. Johnson testified that she has never in her entire career seen a patient, including Plaintiff, with ten to twenty stitches in the clitoral area.

When questioned regarding her stay in PACU and the records, Plaintiff stated she does not recall being in PACU post-surgery and stated "I've disagreed with a lot of the records."

Pat Bishop, a licensed practical nurse who also cared for Plaintiff post-surgery, testified she never heard Plaintiff screaming or crying in pain. Ms. Bishop charted that Plaintiff was experiencing no pain and did not receive anything for pain post-op. Ms. Bishop noted that Plaintiff had scant bleeding on her abdominal band-aid. Ms. Bishop charted that Plaintiff received a meal, ate twenty-five percent of it and tolerated it well. The chart shows Ms. Bishop took Plaintiff's blood pressure and it was 110/70. Plaintiff, however, claims her blood pressure was not taken. Ms. Bishop testified that a patient has to meet certain criteria before they can be discharged, i.e., "their pain has to be controlled, their nausea controlled, and they have to be accompanied by someone. They're not allowed to drive themselves home." Ms. Bishop testified she actually had to see Plaintiff leave with someone upon discharge, not just rely on what Plaintiff said. Prior to discharge, Ms. Bishop made Plaintiff a follow-up appointment with Defendant for June 3rd. Ms. Bishop testified that in her thirty-five years as a licensed practical nurse, she has never seen a patient, including Plaintiff, with twelve to eighteen stitches in their frenulum or clitoris.

Plaintiff claims that after the surgery, Defendant came to her room and told her he did "two extra little surgeries" but that he would not charge her for them. She says Defendant told her he had removed an inclusion cyst and a skin tag and assured her she did not have cancer. She says Defendant guaranteed her there was no cancer and told her there was no need to send the tissues to pathology.

Plaintiff claims that a couple of minutes after Defendant left her room, "a lady came in and told me it was time for me to leave." Plaintiff claims she told this woman she had not called her sister yet, but the woman just told her it was time to leave and that this woman walked her to the door. Plaintiff claims she drove herself home, but does not remember how. The discharge notes made by Pat Bishop, however, show that Plaintiff was given discharge instructions, was ambulatory and in stable condition, and was accompanied by a friend when she left the hospital.

Plaintiff claims when she got home the pain was getting worse, she was "all swollen in the clitoris area and down the side" and there were stitches everywhere. She claims she took some Tylenol and went to bed. Plaintiff claims she spoke to her sister, her boyfriend, and a few female

friends on the phone either that day or over the next couple of days. Plaintiff also allowed some friends to see the area over the course of the next couple of weeks. Plaintiff had one friend take pictures of Plaintiff's vaginal area, and those picture were introduced at trial.

Plaintiff claims that when she went to Defendant's office on June 3rd to have the stitches removed, she told Defendant she thought she was "going to bleed to death." She claims Defendant explained the surgeries to her using pictures and again guaranteed her she did not have cancer. Plaintiff, however, thought Defendant was not being honest with her so Plaintiff got some money from a friend to buy a tape recorder so she could secretly tape Defendant. Plaintiff claims she knew she did not have a skin tag or an inclusion cyst and that she thought Defendant was lying to her.

A couple of days after the stitches were removed, Plaintiff and her sister went to Defendant's office to speak to Defendant, and they secretly tape recorded the conversation. The tape and a transcription of it were introduced at trial. Plaintiff claims she told Defendant they were there because her sister wanted to make sure Plaintiff did not have cancer. After this visit, Plaintiff did not return to Defendant.

Plaintiff claims Defendant either removed or damaged all or a portion of her clitoris. She claims she has not had sexual intercourse with any man since the surgery and that she has not experienced any sexual stimulation that was pleasurable although she has tried masturbation and a vibrator. Plaintiff claims she had no problem with sexual arousal prior to the surgery, but that she is no longer capable of having sexual intercourse.

At the time of the surgery, Plaintiff was dating David Cross. Mr. Cross testified he saw Plaintiff about two days after the surgery when she stopped by his house. Mr. Cross testified Plaintiff looked okay but was complaining that it hurt her to walk. He stated their relationship fell apart after the surgery because Plaintiff was always hurting and complaining. He also testified they never had sex after the surgery.

Shortly after the surgery, in June or July of 2001, Plaintiff met Alan Gates and the two began dating. Plaintiff claims she never had sex with Alan Gates. Plaintiff claims she and Mr. Gates went away to the beach and stayed in a motel together and slept in the same bed naked one time, but that they never had sex. She claims she stimulated him sexually one time on the trip to the beach and over the course of their relationship approximately four times.

Alan Gates testified he had sex with Plaintiff after they had dated for a couple of weeks. He says Plaintiff never complained of any pain or lack of feeling when they had sex. Mr. Gates claims he and Plaintiff had sex at his apartment, at a trailer, on a pontoon boat, on an island during a camping trip, and during trips together out-of-town. He states "[u]sually when we slept together we had sex. I mean, you know, that's normal, I think." Mr. Gates believes Plaintiff had orgasms and states "[i]f she didn't she was putting on a lot." Mr. Gates says their relationship lasted

until March or April and during that time he estimated he and Plaintiff had sex a hundred times, maybe more.

Mr. Gates also testified he had ridden with Plaintiff on a Sea Doo one or two times and that his son had ridden with Plaintiff on it quite a few times. In addition, Mr. Gates stated he had seen his son, Dustin, give Plaintiff rides on an ATV on trails in the woods and through fields. Fifteen-year-old Dustin Gates testified he had given Plaintiff a ride on the Sea Doo three or four times and had also ridden her on the ATV on pretty rough terrain in the woods and that he never heard her complain about pain from the rides.

Plaintiff claims she has ridden on an ATV only one time and that was prior to the surgery. She claims she rode a Sea Doo one time with Alan Gates for about four minutes and claims it hurt so bad that she yelled and scared Alan and they both fell off. She claims she has never ridden a Sea Doo any other time. Plaintiff claims she never rode on an ATV with Dustin.

Plaintiff claims that approximately six weeks after they met, Mr. Gates bought her a Mercedes worth approximately $50,000 for her birthday. Mr. Gates, however, testified that Plaintiff borrowed approximately $50,000 from him early on in their relationship to buy the Mercedes. Mr. Gates claims he and Plaintiff had sex a couple of times before she borrowed the money. Mr. Gates states Plaintiff told him "she was going to be the richest bitch in Johnson City in December . . . ." December was when the trial of this matter originally was scheduled to begin.

Plaintiff claims she broke up with Alan Gates when she discovered he and a friend "had thousands of pills and baggies, trash bags full of Marijuana." She claims Mr. Gates threatened to testify that he had sex with her if she refused to marry him so she would be precluded, as his wife, from testifying against him regarding the drugs.

Plaintiff claims she has been unable to work since the surgery and that she would have to lock the door of her shop "two or three times a day and have to go home and pick up clothing because I would bleed so bad I'd bleed on my clothing." Plaintiff claims she changed pads for bleeding during the eight weeks after surgery "as many as 30 times a day" and that she had even "put towels down there instead of pads." She also claims she couldn't lift or walk much so she just closed up her shop. Plaintiff opened her business, Sea Scape, in September of 1998, and closed it in August of 2000. Plaintiff claims her shop was doing well until the surgery, but that after the surgery she "just couldn't walk because of the pain" and had to close the shop. She did, however, admit to writing bad checks when she first opened her business. Plaintiff also claims she can no longer ride a bicycle or jog and that she "can't wear jeans or anything like that . . ." because of constant pain.

The next doctor Plaintiff saw after the surgery was Dr. Link, a plastic surgeon. Plaintiff went to Dr. Link seeking liposuction surgery or what Plaintiff calls a "tummy tuck." Dr. Link's records show Plaintiff never mentioned to Dr. Link that she was having any problems from the surgery at issue in this case, or even that she recently had surgery. Plaintiff scheduled surgery

with Dr. Link for July 6, 1999, less than two months after the surgery at issue in this case. Plaintiff called and cancelled that surgery on the day of surgery.

Plaintiff did not see a doctor for the problems she claims Defendant caused for approximately a year and a half. She claims she called four or five different doctors and made appointments, but then wouldn't go "[b]ecause I was afraid they were going to tell me that I had cancer or I truly didn't have my clitoris anymore, and I just didn't want to hear it."

After Plaintiff filed this lawsuit, her attorneys sent her to be examined by Dr. Christine Neal. Dr. Neal specializes in obstetrics and gynecology. Dr. Neal testified as one of Plaintiff's expert witnesses during trial. Dr. Neal testified that during her examination of Plaintiff, Dr. Neal saw a segment of Plaintiff's labium minora was missing and that around Plaintiff's clitoris was a white area with some scarring. Dr. Neal testified her initial examination of Plaintiff was limited because Plaintiff was in pain and could not tolerate having the foreskin of the clitoris pushed back. Dr. Neal stated "I did not see a clitoris at all. There was something in there that I couldn't see well. I felt like I needed to get a better exam, but I simply couldn't do it because of the discomfort there." Dr. Neal knows of no treatment to fix the problem she believes Plaintiff has. Dr. Neal believes Plaintiff's complaints are consistent with Dr. Neal's physical findings. Dr. Neal admitted that Plaintiff's having had an abortion several weeks before her surgery could have caused bleeding, but she stated the bleeding should have stopped within about two weeks after the procedure. Dr. Neal also admitted that during her career she had never done or seen a clitoral circumcision, other than this case.

Dr. Neal referred Plaintiff to Lauree Ramsden, a licensed clinical social worker, whom Plaintiff saw four or five times. Ms. Ramsden contacted Dr. Neal recommending medication and Dr. Neal prescribed Zoloft.

Plaintiff's attorneys also sent her to be examined by Dr. William Saye, who specializes in gynecology. Dr. Saye also testified at trial as an expert for Plaintiff. Dr. Saye examined Plaintiff and explained at trial that he found "looking at the perineal area, the little rabbit ears that I described to you were asymmetrical. One side didn't look like the other side. . . . And that was the right side." He also noted Plaintiff's clitoris did not look symmetrical. Dr. Saye testified that when he pulled back the hood to visualize the clitoris, this caused Plaintiff discomfort. Dr. Saye stated "that the right side of the clitoris was no longer present. And at the base of the clitoris, this side, was an area that I described in my note as something that looked like a crater." Dr. Saye also stated he saw "[o]n the right side of the vagina there was a scar that was about a centimeter and a half that still had the evidence of two big sutures that had been placed in this area." Dr. Saye opined after examining Plaintiff that "the right side of the clitoris was no longer present" and that there was a crater and something was missing. His finding was "an abnormal right labia minora, an abnormal clitoris and a scar on the right inside of the vagina." Dr. Saye opined Plaintiff's condition could have been caused by an injury or an electrical burn rather than a total excision of the clitoris. Dr. Saye opined the injury may have been caused by electrocautery used during the surgery at issue in this case.

In addition to their separate examinations of Plaintiff, Dr. Neal and Dr. Saye conducted a joint examination of Plaintiff on July 8. Pictures were taken during this examination and were introduced at trial. Dr. Neal stated that at this examination Plaintiff was not experiencing as much tenderness and Dr. Neal explained:

> [I] was able to pull the foreskin over the clitoris back a little better. The little thing that I had seen that I wasn't sure what it was I was now pretty certain was part of the clitoris remaining. Dr. Saye and I did look at that together, and we both felt comfortable that that's what we were seeing.

Dr. Neal explained the difference between her findings and Dr. Saye's findings is that Dr. Saye is certain the little tiny something they saw was clitoral tissue and Dr. Neal is not sure, but believes it may be clitoral tissue.

Defendant testified regarding the surgery he performed on Plaintiff. Defendant claims he saw Plaintiff on the morning of the surgery and spoke to her prior to the surgery. He went to discuss the insurance situation with Plaintiff after he was informed Plaintiff's insurance would not pay. He stated Plaintiff requested he proceed with the surgery anyway. Defendant testified he also spoke to Plaintiff while she was in the holding area prior to surgery and that this is where Plaintiff requested removal of a skin tag. Defendant claims Plaintiff called him over and "indicated to me that she had a bump or a skin tag . . . [o]n the right side of her vagina and would I remove it?" Defendant told her that if he could identify it and it was very minor he would go ahead and do that. Defendant claims Plaintiff was lucid and "[s]he knew who I was. She knew where she was. . . . It was my assessment that she was absolutely aware and alert." There were no other witnesses to this conversation and Defendant did not ask Plaintiff to sign a consent form for the removal of the skin tag. Defendant stated this conversation occurred before Plaintiff received Versed and was moved into the operating room, but after Plaintiff had received Valium. Defendant explained that the anesthesiologist is with the patient from the time the Versed is administered through the IV line throughout the surgery. Defendant admitted Versed causes amnesia.

Defendant explained he began the surgery by removing the skin tag by "lifting it up with pick-ups, which is like a tweezers and taking a small scissors and, and cutting it at its base and then putting two stitches across that edge to keep those edges together at that time." Defendant estimated the skin tag was at approximately the eleven o'clock position. Defendant explained that the skin tag he removed was on Plaintiff's right labia minora and the inclusion cyst that Dr. Gant removed years earlier was on the left labia minora. Defendant testified he did not remove a cyst.

Defendant believes it was within the standard of care to remove the skin tag stating "[w]e do things our patients ask us to do if they're minor and they don't cause them any harm and they know what they're asking about." Defendant stated he did nothing to Plaintiff except perform a tubal ligation and remove a skin tag. Defendant explained there was no reason to preserve this skin

tag and send it to the lab for testing. Defendant, however, stated that he would have sent an inclusion cyst to the laboratory if he had removed one.

Defendant explained that Plaintiff had two stitches from the removal of the skin tag and stitches in the naval from the tubal ligation and no other stitches. There were two suture sets used in the surgery, one for the vaginal part of the procedure and one for the abdominal part. They could not use the same suture set for both areas because the areas have two different levels of sterility. Plaintiff's expert, Dr. Neal, when questioned stated if you had 15 to 20 stitches in the vaginal area you would use at least three suture sets in that area and if you had 5 to 10 stitches you would use at least two suture sets. Plaintiff filed an affidavit claiming she had 10 to 12 stitches in the vaginal area and told Dr. Neal that she had 15 to 20 stitches.

The surgery took approximately twenty-three minutes and Defendant stated if there had been the number of stitches Plaintiff claims, it would have taken considerably longer. Defendant stated "This procedure, to be done by me in this amount of time, means that it went very well. I didn't have any, we didn't have any glitches. Everything went smoothly to do the skin tag and tubal ligation in, in twenty-three minutes. We're not trying to break records or speed records, but that means there weren't any problems." In their pre-surgery conversation, Defendant told Plaintiff she might have a stitch from the skin tag and "that's really all I told her because that, there really aren't any complications from taking off skin tags. They're very minor."

Defendant stated the scar Plaintiff has is compatible with the laceration noted in the records from the birth of Plaintiff's child in 1978. Defendant testified there was no electrocautery used during the surgery that could have caused any of the complaints Plaintiff has. Defendant testified "[t]here was no cautery used in the vaginal area whatsoever." He explained that if something is cauterized it is burned. Defendant stated that it was not even a possibility the bipolar electrocautery came into contact with the clitoris as Dr. Saye opined.

Dr. Christopher Mitchell, the resident who assisted Defendant with Plaintiff's surgery, also testified at trial. Dr. Mitchell testified that as he and Defendant scrubbed for Plaintiff's surgery, Defendant told him Plaintiff had requested the removal of a skin tag from her labia. Dr. Mitchell testified that during the surgery, Defendant grasped the skin tag with forceps and snipped it off with a pair of scissors and used a couple of interrupted sutures to stop the bleeding. He stated it was "very straightforward. A simple task." Dr. Mitchell estimated the skin tag was roughly between the nine and ten o'clock position three or four centimeters from the clitoris. He testified that after the skin tag was removed, they proceeded to perform the tubal ligation. Dr. Mitchell testified no electrocautery was used in the vaginal area.

Catherine Hooten, the surgical tech who assisted in the operating room, also testified at trial. Ms. Hooten testified the bipolar electrocautery device is approximately eighteen inches long in its assembled state. Ms. Hooten testified she has seen skin tags removed that weren't listed on the consent form and stated that usually the patient has requested removal after the consent was signed. Ms. Hooten stated that very often the skin tag is simply thrown away after removal and is

not sent to the lab. Ms. Hooten testified she had a total view of both areas of the surgical site, Plaintiff's vaginal area and her abdominal area, and stated neither Plaintiff's clitoris nor her frenulum were removed in whole or in part. Ms. Hooten testified it usually takes approximately thirty minutes for Defendant to perform an uncomplicated bilateral tubal ligation.

Emma Rastell is a now-retired licensed practical nurse who worked for Defendant during the relevant time period. Ms. Rastell testified that she observed one stitch in Plaintiff's vaginal area during Plaintiff's post-surgery visit to Defendant's office.

Dr. Charles Hillman, Defendant's expert witness, testified Valium, which Plaintiff received prior to her pre-surgery conversation with Defendant, is an anti-anxiety medication. Dr. Hillman stated "[i]t's not considered a sedative or an anesthetic, but it's used usually preoperatively just to calm patients, and make them better able to comprehend what's happening to them and prepare them for surgery." Dr. Hillman stated it is a judgment call on the part of the physician as to whether a patient is conscious and aware and capable of making decisions. Dr. Hillman opined that Defendant met the standard of care regarding removal of the skin tag. Further, Dr. Hillman stated skin tags usually are not sent to pathology. That decision is left up to the physician.

Dr. John Rock, Defendant's other expert witness, is a reconstructive surgeon who does specialized surgery. Dr. Rock's areas of interest include congenital abnormalities of the pelvis, uterus, vagina, external genitalia, clitoris, labia minora, and majora. He also sees patients with structural abnormalities and has treated women and recreated their clitoris after the clitoris has been circumcised. Dr. Rock opined that "[Defendant] did not remove any part of the clitoris, or the prepuce, or the frenulum. He did have a removal of a skin tag, but that is the only thing, in my opinion, that was removed." Dr. Rock does not believe the surgery caused any injury to Plaintiff.

Dr. Rock examined Plaintiff in January of 2001. Dr. Rock located Plaintiff's clitoris and testified "I actually picked up, palpated the clitoris, the clitoris was there, pulled back the prepuce, and visualized the glans. The glans was there. The frenulum were intact . . . ." Dr. Rock used the photographs taken during Dr. Neal and Dr. Saye's joint examination to illustrate his points stating "if they knew how to examine external genitalia they'd have the answer. [Dr. Neal's] almost grasping the clitoris. . . . So there's a base knowledge defect in terms of understanding clitoral anomaly on the part of the examiner." Dr. Rock saw no evidence of a crater. Dr. Rock stated that if the right side of Plaintiff's clitoris were missing it would had to have been resected and he explained that in order for this to happen

> you do a circumferential incision in the top of the, of the dorsal area of the skin,
> mobilize the skin down to expose the, the entire shaft of the clitoris, and then you
> would actually make an incision in the corpora on that side and take out a segment,
> or wedge, and, and then you use electro-cautery or suture if you get your hemostasis.

The case was tried on Plaintiff's Second Amended Complaint. In her Second Amended Complaint, Plaintiff alleged Defendant was liable to her because of his "intentional

conduct and/or negligence" and for "medical battery." The jury found for Defendant and a judgment was entered dismissing Plaintiff's case against Defendant. Plaintiff filed a motion for new trial, which the Trial Court denied. Plaintiff appeals to this Court.

### Discussion

Although Plaintiff raises eleven issues on appeal, resolution of several of these issues would require this Court to consider what Plaintiff describes as newly discovered evidence or post-judgment facts. We entered an order on September 19, 2003, denying Plaintiff's request to supplement the record by newly discovered evidence and an order on December 5, 2003, denying Plaintiff's motion to consider post-judgment facts. As such, we will not consider Plaintiff's issues relating to what Plaintiff describes as newly discovered evidence or post-judgment facts.

We restate the issues properly before us on appeal as: 1) whether the Trial Court erred in allowing Plaintiff's abortion consent form to be admitted into evidence; 2) whether the Trial Court erred in allowing the admission of evidence regarding Plaintiff's personal finances, the status of Plaintiff's company, and Plaintiff's failure to file income taxes; 3) whether the Trial Court erred in allowing the admission of evidence regarding the birth of Plaintiff's second child; 4) whether the Trial Court erred in excluding as evidence the last page of a hospital bill; 5) whether the Trial Court erred in allowing Dustin Gates to testify; and 6) whether there was material evidence to support the jury's verdict. Defendant also raises an issue regarding whether this is a frivolous appeal.

Issues regarding admission of evidence in Tennessee are reviewed for abuse of discretion. *Dickey v. McCord*, 63 S.W.3d 714, 723 (Tenn. Ct. App. 2001). "[T]rial courts are accorded a wide degree of latitude in their determination of whether to admit or exclude evidence, even if such evidence would be relevant." *Id*. Our Supreme Court discussed the abuse of discretion standard in *Eldridge v. Eldridge*, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to [the] propriety of the decision made." A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

Appellate courts ordinarily permit discretionary decisions to stand when reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id*. When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id*.

We begin by considering whether the Trial Court erred in allowing Plaintiff's abortion consent form to be admitted into evidence. Plaintiff filed a motion *in limine* seeking, among other things, to have excluded all evidence pertaining to her abortions. The Trial Court entered an order on August 20, 2002, holding that evidence of the abortion Plaintiff had one month prior to the surgery at issue was relevant and admissible. The order excluded evidence regarding all previous abortions. At trial, the only evidence introduced regarding Plaintiff's abortions was the consent form from the abortion that Plaintiff received one month prior to the surgery at issue. This consent form listed possible complications of the procedure, including bleeding. At trial, Dr. Neal, Plaintiff's expert witness, testified bleeding was a possible complication of an abortion. As one of Plaintiff's complaints in this suit regards heavy bleeding, evidence showing that bleeding is a possible complication of a surgical procedure Plaintiff had only one month prior to the surgery at issue was relevant and admissible.

Further, we note that at the beginning of the voir dire, the Trial Court told the potential jury members that Plaintiff had obtained an abortion one month prior to the surgery at issue and asked the potential jurors if this information would affect their verdict. Several potential jurors did state that knowledge of Plaintiff's abortion could affect their verdict and in each of these situations, the Trial Court excused the potential juror. The members of the final jury panel each indicated they either were not opposed to abortion, or that their personal feelings regarding the subject would not affect their verdict in any way.

We believe reasonable minds could disagree as to the propriety of the decision made by the Trial Court to admit the abortion consent form, the very essence of a discretionary decision. We believe this to be especially so given Dr. Neal's testimony that bleeding is a possible complication of an abortion, and the Trial Court's pre-emptive measures taken in voir dire. Given these pre-emptive measures taken by the Trial Court, even if it were error by the Trial Court to admit the abortion consent form, we hold that such error did not more probably than not affect the judgment or result in prejudice to the judicial process. *See* Tenn. R. App. P. 36(b). Given this, we will not substitute our judgment for that of the Trial Court, and we find no abuse of discretion or reversible error regarding the admission of the abortion consent form.

We next consider whether the Trial Court erred in allowing the admission of evidence regarding Plaintiff's personal finances, the status of Plaintiff's company, and Plaintiff's failure to file income taxes. Plaintiff filed a motion *in limine* requesting, among other things, the exclusion of evidence pertaining to Plaintiff's financial status and business practices. The Trial Court's August 20, 2002, order held the Defendant could offer evidence regarding Plaintiff's financial problems "if the plaintiff makes or has made statements that would be contradicted by such evidence" or "as it relates to motivation or credibility."

During cross-examination, Plaintiff was asked if her business was in dire financial straits. She denied it was. A letter from another attorney who had represented Plaintiff then was introduced. This letter, written to Plaintiff's creditors, suggested that Plaintiff qualified to file for bankruptcy and asked the creditors to agree to allow Plaintiff to make small payments instead.

-11-

Plaintiff then was asked if her business at the time the letter was written was in essence insolvent. Plaintiff denied this assertion. Plaintiff, however, admitted to writing bad checks. As far as the evidence regarding payment of income taxes, Plaintiff swore during her deposition that she did file income tax forms every year and that she could provide copies for the past few years. Plaintiff later claimed someone broke into her house and stole only a box from her closet where she kept important records such as the tax returns. When ordered by the Trial Court to obtain copies from the government, Plaintiff finally admitted she had not filed her income taxes for the requested years despite her sworn deposition testimony to the contrary.

The Trial Court allowed Defendant to offer evidence regarding Plaintiff's financial problems "if the plaintiff makes or has made statements that would be contradicted by such evidence" or "as it relates to motivation or credibility." Plaintiff made several inconsistent statements under oath regarding her financial status and the status of her business. At a minimum, we believe reasonable minds could disagree as to the propriety of the decision made by the Trial Court to admit the evidence of Plaintiff's financial condition to impeach her credibility, the very essence of a discretionary decision. Given this, we will not substitute our judgment for that of the Trial Court, and we find no abuse of discretion regarding the admission of the evidence of Plaintiff's financial condition.

We next consider whether the Trial Court erred in allowing the admission of evidence regarding the birth of Plaintiff's second child. This evidence showed Plaintiff had some vaginal scarring and was relevant because the scarring appears in the area where Plaintiff claims Defendant performed unwanted surgery. Tennessee Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence of prior scarring in the same area where Plaintiff claims Defendant performed unwanted surgery is relevant to a determination of whether Defendant caused the damages about which Plaintiff complains. As the evidence unquestionably was relevant, and reasonable minds at least could disagree as to the propriety of the decision made by the Trial Court to admit the evidence regarding the birth of Plaintiff's second child, once again the very essence of a discretionary decision, we will not substitute our judgment for that of the Trial Court. We find no abuse of discretion in the Trial Court's decision to admit the evidence regarding the birth of Plaintiff's second child.

We next consider whether the Trial Court erred in excluding as evidence the last page of a hospital bill. The Trial Court admitted into evidence the pages of the bill in question that listed supplies and a corresponding charge for each item or items. The Trial Court, however, refused to admit the last page of the bill that contained only a description of miscellaneous and a corresponding charge. Plaintiff had no testimony or other evidence to explain to the jury anything about the charge listed on the last page of the bill. The Trial Court stated such a description would force the jury to speculate regarding what supplies were encompassed within the charge for these miscellaneous items. A jury may not engage in speculation. *Stringer v. Cooper*, 486 S.W.2d 751, 756 (Tenn. Ct. App. 1972) (stating "we understand the holding in those cases and many more like them to be that

-12-

a jury may not speculate as to cause when one is not shown . . . ."); *Moon v. Johnston*, 337 S.W.2d 464, 469 (Tenn. Ct. App. 1959) (holding a jury is not permitted to speculate or guess as to proximate cause). Without any testimony or other evidence to explain to the jury what these charges were for, this evidence simply was not relevant and, therefore, not admissible. Tenn. R. Evid. 401 and 402. As such, the Trial Court properly excluded the last page of the hospital bill. We note, once again, that the Trial Court's decision to exclude this evidence is one about which reasonable minds could disagree as to the propriety of that decision, and we find no abuse of discretion in the Trial Court's decision to exclude this unexplained and speculative evidence.

Next, we consider whether the Trial Court erred in allowing Dustin Gates to testify. Plaintiff argues that Dustin Gates' identity and testimony never were properly disclosed during discovery and, therefore, Dustin Gates should have been precluded from testifying. Plaintiff admits that Dustin Gates was listed on Defendant's timely filed witness and exhibit list. Plaintiff, however, claims she submitted interrogatories to Defendant that requested Defendant "to identify all possible witnesses in the case." Plaintiff claims Defendant did not list Dustin Gates as a possible witness in his answers to these interrogatories. As such, Plaintiff claims Defendant did not comply with the Rules of Civil Procedure regarding discovery and Dustin Gates should have been prevented from testifying. Unfortunately, neither a copy of the interrogatories nor Defendant's answers to them are in the record before us on appeal. Because Plaintiff has admitted that Defendant timely filed his witness and exhibit list which named Dustin Gates as a witness and as we do not have before us in this record Defendant's interrogatory answers upon which Plaintiff bases her argument, we find that no error occurred when the Trial Court allowed Dustin Gates to testify.

Finally, we consider whether there was material evidence to support the jury's verdict. "Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

Defendant testified he did nothing to Plaintiff except perform a tubal ligation and remove a skin tag and that he did not fall below the standard of care in doing so. Defendant testified Plaintiff called him over and "indicated to me that she had a bump or a skin tag . . . [o]n the right

side of her vagina and would I remove it?" Defendant claims Plaintiff was lucid and "[s]he knew who I was. She knew where she was. . . . It was my assessment that she was absolutely aware and alert." Defendant also testified that for him to perform the removal of the skin tag and a tubal ligation in twenty-three minutes meant there were no complications.

Dr. Mitchell, the resident who assisted with Plaintiff's surgery, and Ms. Hooten, the surgical tech, also both testified regarding the surgery and both maintained that Defendant only removed a skin tag and performed a tubal ligation and that nothing was done to Plaintiff's clitoris. Dr. Mitchell described the removal of the skin tag as "very straightforward. A simple task." Ms. Hooten testified it usually takes approximately thirty minutes for Defendant to perform an uncomplicated bilateral tubal ligation.

Ms. Johnson, the registered nurse who cared for Plaintiff in PACU, testified Plaintiff's stay in that unit was uneventful and that Plaintiff did not have ten to twenty stitches in the clitoral area, as Plaintiff claims. Ms. Johnson charted that when Plaintiff left PACU, she was breathing well, was comfortable, reported that her pain had eased and had no vaginal bleeding. The records show Plaintiff received what Ms. Johnson described as a smaller than normal dose of pain medication in PACU. Ms. Bishop, a licensed practical nurse who also cared for Plaintiff post-surgery, testified she never heard Plaintiff screaming or crying in pain. Ms. Bishop charted that Plaintiff was given discharge instructions, was ambulatory and in stable condition, and was accompanied by a friend upon discharge. Ms. Bishop also testified that Plaintiff did not have twelve to eighteen stitches in the clitoral area. Ms. Rastell, a licensed practical nurse who worked for Defendant, saw Plaintiff during her post-surgery visit to Defendant's office and testified Plaintiff had only one stitch in the vaginal area.

Dr. Hillman, Defendant's expert witness, testified it is a judgment call on the part of the physician as to whether a patient is conscious and aware and capable of making decisions. Dr. Hillman opined that Defendant met the standard of care regarding removal of the skin tag and stated skin tags are usually not sent to pathology, but that decision is left up to the physician.

Defendant's expert witness, Dr. Rock, examined Plaintiff and opined that "[Defendant] did not remove any part of the clitoris, or the prepuce, or the frenulum. He did have a removal of a skin tag, but that is the only thing, in my opinion, that was removed." Dr. Rock also testified he does not believe the surgery caused any injury to Plaintiff. Dr. Rock located Plaintiff's clitoris and testified "I actually picked up, palpated the clitoris, the clitoris was there, pulled back the prepuce, and visualized the glans. The glans was there. The frenulum were intact . . . ." Dr. Rock used the photographs taken during Dr. Neal and Dr. Saye's joint examination to illustrate his points and stated "if they knew how to examine external genitalia they'd have the answer. [Dr. Neal's] almost grasping the clitoris. . . . So there's a base knowledge defect in terms of understanding clitoral anomaly on the part of the examiner."

Alan Gates testified he met Plaintiff after the surgery and that during the course of their relationship he had sex with Plaintiff a hundred times, maybe more, at various places including

at his apartment, at a trailer, on a pontoon boat, on an island during a camping trip, and during trips together out-of-town. He testified Plaintiff never complained of any pain or lack of feeling when they had sex. Mr. Gates testified he believes Plaintiff had orgasms and states "[i]f she didn't she was putting on a lot." In addition, both Alan Gates and Dustin Gates testified Plaintiff rode on a Sea Doo and an ATV and never complained of pain.

The jury was entitled to find the evidence presented in favor of Defendant more credible than the evidence presented by Plaintiff, and clearly they did so. Taking the strongest legitimate view of all the evidence in favor of the verdict, assuming the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and discarding all evidence to the contrary, as we must, we find there was material evidence to support the jury's verdict. We, therefore, must and do affirm the jury verdict in favor of Defendant.

In the exercise of our discretion, we decline to hold that this is a frivolous appeal and further decline to award Defendant attorney's fees.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Donna S. Young, and her surety.

_____
D. MICHAEL SWINEY, JUDGE